## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**TERRY C.,**

   **Plaintiff,**

**v.**

**KILOLO KIJAKAZI,** *Acting Commissioner, Social Security Administration,*[1]

   **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:20-cv-04199-AJB**

### <u>ORDER AND OPINION</u>[2]

Plaintiff Terry C. brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for disability insurance benefits ("DIB") under the Social

_____

[1]    Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration.  Under the Federal Rules of Civil Procedure, Kijakazi "is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entry dated Oct.14, 2020).  Therefore, this Order constitutes a final Order of the Court.

Security Act.[3]  For the reasons set forth below, the Court **REVERSES** the final

decision of the Commissioner **AND REMANDS** the case to the Commissioner for

further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed his application for DIB on May 17, 2017, alleging disability

commencing on October 11, 2012.  [Record (hereinafter "R") 231-39].  Plaintiff's

application was denied initially and on reconsideration.    [R76-94, 95-111].

Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").

[R126-27].  An evidentiary hearing was held on January 28, 2020.  [R37-73].  The

ALJ issued a decision on March 2, 2020, denying Plaintiff's application on the

---

[3]      Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq.,
provides for Supplemental Security Income ("SSI") for the disabled.  Title II of
the Social Security Act provides for DIB.  42 U.S.C. § 401, et seq.  Title XVI claims
are not tied to the attainment of a particular period of insurance eligibility.  *Baxter
v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  The relevant law and
regulations governing the determination of disability under a claim for DIB are
identical to those governing the determination under a claim for SSI.  *Davis v.
Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Title 42 U.S.C. § 1383(c)(3) renders
the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.
Thus, in general, the legal standards to be applied are the same regardless of
whether a claimant seeks DIB, to establish a "Period of Disability," or to recover
SSI.  However, different statutes and regulations apply to each type of claim.  Many
times, parallel statutes and regulations exist for DIB and SSI claims. The Court's
citations should be considered to refer to the appropriate parallel provision as
context dictates.  The same applies to citations of statutes or regulations found in
quoted court decisions.

ground that he had not been under a "disability" at any time through the date of the decision.   [R16-36].   Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on August 13, 2020, making the ALJ's decision the final decision of the Commissioner.   [R1-6].

Plaintiff then filed an action in this Court on October 12, 2020, seeking review of the Commissioner's decision.   [Doc. 1].   The answer and transcript were filed on April 20, 2021.   [Docs. 10-11].   On May 28, 2021, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 16], on June 28, 2021, the Commissioner filed a response in support of the decision, [Doc. 17], and Plaintiff filed a reply brief on July 22, 2021, [Doc. 20].   On August 16, 2021, Plaintiff filed a Notice of Supplemental Authority.   [Doc. 21]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).[4]

## II.   PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issues to be decided are whether (1) an ALJ has a duty to make clear findings regarding a claimant's work history and

---

[4]     Neither party requested oral argument.  (*See* Dkt.).

earnings, and (2) an ALJ is required to provide specific reasons for his findings on Plaintiff's testimony that are supported by the evidence.  [Doc. 16 at 5].

## III.   **STANDARD FOR DETERMINING DISABILITY**

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits.   20 C.F.R.  §§  404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden

of proving disability.   20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[5] *on other grounds as stated in Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).   The claimant must prove at step one that he is not undertaking substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   At step three, if the impairment

---

[5]     Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.   *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).   Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.   *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*,

6

245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## IV.    <u>SCOPE OF JUDICIAL REVIEW</u>

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.   Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).   This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.   *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*,

804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## V.   STATEMENT OF FACTS[6]

### A.   Background

Plaintiff was a younger individual as of his alleged onset date and was of advanced age as of his last date insured, had completed high school, and previously worked as a real estate agent and administrative clerk.  [R43, 68, 233, 258].  Plaintiff alleges disability due to Parkinson's disease and anxiety.  [R22].

### B.   Lay Testimony

At the hearing, the ALJ noted Plaintiff was present with a non-attorney representative.  [R42].  Plaintiff was then placed under oath, [*id.*], and testified as follows.  He was 56 years old, born in 1963, lived in a house with his wife and three children, had a driver's license, but got dizzy moving his head back and forth and driving at night.  [R43-44].  He had a high school diploma and worked part time from 2002 to 2009 helping his wife with her real estate work.  [R44].  He did have his real estate license but was not really good at it.  [R44-45].  From 2009 up until 2013 he did clerical work, ghostwriting, for his wife's business.  [R45].  His wife

---

[6]     In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 16-17, 20; *see also* Doc. 15 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")].  Where a party's numbering conflicts with the page numbers assigned by the Court's electronic filing system, the Court's citations will utilize the page numbering assigned by the Court's electronic filing system.

was hired to write books and articles but when she started building the business she needed help; she taught him how to write and, when she had too much work, he would do some of it. [R46]. He helped her when she needed help and did not work set hours because there was not always work to do. [*Id.*]. All his work was done on a computer. [R47]. Around 2013, he had to lessen his work because his dizziness kept getting worse when he tried to track or scroll. [R47-48]. In 2013, he was doing maybe 20 to 25 hours a week and it kept getting to be less and less until a year and a half ago when he could not do it anymore. [R48]. Between 2013 and 2015 he worked 20 hours a week and he gave up working in 2016 or 2017. [R49]. After 2013, he was not bringing in any earnings and it was all coming from his wife. [*Id.*].

He described his main problem as dizziness from reading and scanning but he also had tremors that started getting worse in 2013. [R49-50]. It took about two years for them to figure out what medication he needed. [R50]. That helped for around four or five years but a year and a half before the hearing the tremors started getting worse again. [*Id.*]. In 2016 to 2017 he stopped working because he got tired of being dizzy all the time. [R51]. When he started out, he could work for an hour or two but then would need to lay down for an hour and a half to two hours. [R51]. Over the last three to four years, he could only work for one hour and then

10

only for 30 minutes.  [R51-52].

He could not go to the grocery store or anywhere he needed to look back and forth.  [R52].  Stress made his tremors worse and he could not eat any animal protein because it interfered with his medication.  [R52-53].  He said the tremors were not as bad as they used to be and the medication pretty much kept them under control.  [R53].  The tremors did affect his ability to write.  [*Id.*].  He experienced really bad insomnia and woke up between eight and ten times at night.  [R54].  He could not nap during the day but the lack of sleep made his Parkinson's worse. [*Id.*].  He had also had muscle atrophy, lost a lot of weight, and passed out in the kitchen due to low blood pressure.  [R55].  He also had a stroke in 2015 or 2016. [*Id.*].  Plaintiff thought he could carry 5 to 10 pounds and stand for 15 to 20 minutes before his legs got rubbery and his dizziness got worse.  [R56].  He cooked occasionally and dusted once in a while but did not clean that much.  [*Id.*].

Plaintiff was then questioned by his counsel and testified as follows.  [R57]. He had lost about 110 pounds in six years.  [R57-58].  He stated that his fatigue got bad sometimes and he could walk short distances but tried to stay away from stairs or steps.  [R58].  He could walk about 100 feet without difficulty.  [R58-59].   He did not think he could stand for two hours in an eight-hour workday.  [R60].  He also could not sit for six of eight hours without needing to lay down and could not

11

bend over.  [*Id.*].  He could not reach for things high above his head without getting dizzy.  [R61].  His ability to walk, lift, and stand had gotten progressively worse over the last three years.  [R61-62].  All of his medications caused dizziness.  [R63].  His Sinemet[7] gave him dyskinesia.[8]  [*Id.*].  He could dress himself except for putting a belt through loops.  [R64].  He could not do chores outside and was very sensitive to the cold.  [R64-65].  Being in crowds made him anxious and worsened his symptoms.  [R65].  He felt as though he could do 10 or 15 minutes of computer work before needing to lay down.  [R66].

C.   **Medical Records**

On March 13, 2013, Plaintiff was seen at Emory Healthcare for dizziness after being referred by Michael Silver, M.D.  [R333].  The notes indicate Dr. Silver was still considering whether Plaintiff had Parkinson's disease.  [*Id.*].  Plaintiff did

---

[7]      "Sinemet contains a combination of carbidopa and levodopa.  Sinemet is used to treat symptoms of Parkinson's disease, such as muscle stiffness, tremors, spasms, and poor muscle control," "Sinemet," drugs.com, available at: https://www.drugs.com/sinemet.html (last accessed Mar. 23, 2022).

[8]      "Dyskinesias are involuntary, erratic, writhing movements of the face, arms, legs or trunk. They are often fluid and dance-like, but they may also cause rapid jerking or slow and extended muscle spasms.  They are not a symptom of Parkinson's itself.   Rather, they are a complication from some Parkinson's medications," "Dyskinesia," Parkinson's Foundation, available at: https://www.parkinson.org/Understanding-Parkinsons/Symptoms/Movement-Symptoms/Dyskinesia (last accessed Mar. 23, 2022).

not use a cane or walker and did not fall.  [*Id.*].  A review of systems indicated that Plaintiff had abnormal balance, headache, and anxiety.  [R334].  Plaintiff stated that he worked as a writer.  [*Id.*].  A physical examination indicated that Plaintiff had increased micro square wave jerks in his eyes.  [*Id.*].  He was also noted to have normal gait speed, to be alert and oriented, to have normal motor function, and normal coordination in his upper and lower extremities.  [*Id.*].  Plaintiff was diagnosed with a perception of imbalance with no falls and it was suggested that he might have some mild Parkinson's disease.  [R335].  There was no neurologic cause for imbalance and the notes indicated it might be phobic postural vertigo. [*Id.*].

On May 9, 2013, Plaintiff was seen by Dr. Silver complaining of what Dr. Silver had called Parkinson's disease plus psychogenic movement disorder. [R356].  Dr. Silver indicated that the first time he saw Plaintiff, he believed he had no Parkinson's disease, but when he saw him again off his medication he was struck by his Parkinson's disease.  [*Id.*].  His bradykinesia[9] was found to be gone.  [*Id.*].

---

[9]     "Bradykinesia means slowness of movement, and it is one of the cardinal symptoms of Parkinson's.  You must have bradykinesia plus either tremor or rigidity for a Parkinson's diagnosis to be considered," "Bradykinesia (Slowness of Movement)," Parkinson's Foundation, available at: https://www.parkinson.org/Understanding-Parkinsons/Symptoms/Movement-Symptoms/Bradykinesia-Slowness-of-Movement (last accessed Mar. 23, 2020).

Plaintiff reported wild dreams and poor sleep.  [*Id.*].  On a motor examination, his strength and bulk were normal and his tone was just barely increased.  [R357]. Dr. Silver observed left hand rest tremor and left and right-hand tremors floridly when walking.  [*Id.*].  Dr. Silver noted that Plaintiff's anxiety and Parkinson's disease were much better than before and that his tremors were mostly gone. [R358].

On December 19, 2013, Plaintiff was seen at the Emergency Department ("ED") at Gwinnett Medical Center – Lawrenceville.  [R395].  A mental status exam indicated that Plaintiff had normal ambulatory status, no muscle weakness, and Parkinson's disease with mild tremors; was alert and oriented to person, place, and time; and had a normal gait.  [*Id.*].  Plaintiff went to the ED due to a possible stroke but upon arrival his symptoms improved.  [R396].  Plaintiff denied fatigue and diarrhea.  [R397].  On physical exam, Plaintiff appeared alert but in mild distress, and his mood and affect were noted to be normal.  [*Id.*].  His primary diagnosis was transient cerebral ischemia[10] and headache.  [R399].

---

[10]    A transient ischemic attack (TIA) is a stroke that lasts only a few minutes.  It happens when the blood supply to part of the brain is briefly blocked. Symptoms of a TIA are like other stroke symptoms, but do not last as long. They happen suddenly, and include numbness or weakness, especially on one side of the body.    Transient    Ischemic    Attack, https://medlineplus.gov/transientischemicattack.html (last accessed Mar. 25, 2022).

On July 18, 2014, Plaintiff was seen by Dr. Silver for Parkinson's disease. [R352]. Dr. Silver noted he had not seen Plaintiff in over a year and Plaintiff informed him that his tremors had gotten worse over the last six months. [*Id.*]. A motor exam indicated that his strength and rapid alternating movements were normal, his tone was barely increased, and his bulk was normal. [R353]. Dr. Silver noted that right hand rest tremor was present for most of the exam and, oddly, when he applied pressure to the right hand, the tremor would abate and transfer to the left hand. [*Id.*]. He noted that Plaintiff's Parkinson's disease had bizarre features but truly believed Plaintiff had idiopathic Parkinson's with some emotional/psychogenic features. [R354].

On November 10, 2015, Plaintiff was seen by Dr. Silver for what Dr. Silver had called Parkinson's disease in the past. [R348]. However, Dr. Silver now suspected that Plaintiff's strange abdomen movements might be a psychogenic movement disorder. [R348]. Dr. Silver noted that he had last seen Plaintiff a year and a half ago but now Plaintiff was sleeping badly and had repetitive movements in his body while asleep. [*Id.*]. Plaintiff reported that his handwriting got shaky after writing for some time. [*Id.*]. A cranial nerve exam showed slight

15

hypomimia [11] and a motor exam showed normal strength, rapid alternating movements, tone, and bulk. [R349]. Dr. Silver also noted left foot rest tremor, and very slight right and left hand rest tremors. [*Id.*].

On December 21, 2016, Plaintiff was seen by Dr. Silver complaining of Parkinson's disease but what Dr. Silver suspected was a psychogenic movement disorder. [R340]. He stated that he had never been "completely sure" about the Parkinson's diagnosis and there had been a lot of psychiatric issues and he felt there was some psychogenic overlay. [*Id.*]. Dr. Silver noted resting hand tremor that looked like Parkinson's disease. [*Id.*]. On exam, Plaintiff's strength, rapid alternating movements, tone, and bulk were normal, and no tremors were identified. [R342]. Dr. Silver noted slight hypomimia upon a cranial nerve exam. [*Id.*]. Dr. Silver's impression was of a 53-year-old man with Parkinson's who had "a very good story for PD but nothing to show for it on exam." [R343]. Dr. Silver noted

---

[11]     "Hypomimia – also known as 'facial masking' – refers to a loss or reduction of facial expressions. A common symptom of Parkinson's, it is characteri[z]ed by slower and less pronounced facial movements," "What is hypomimia or facial making in Parkinson's," Verity Willcocks, Ph.D., EPDA, available at: https://www.epda.eu.com/latest/news/what-is-hypomimia-or-facial-masking-in-parkinsons/ (last accessed Mar. 23, 2022).

that Plaintiff now seemed to either be completely cured of his Parkinson's or so well controlled that he demonstrated no symptoms.  [*Id.*].

On June 16, 2017, Plaintiff completed a Work History Report indicating that he did clerical work from 2009 to 2013 off and on for his wife's ghostwriting business.  [R264].  He indicated that the worked 4 hours a day, 5 days per week, and made $50,000 per year.  [R265].

On August 17, 2017, Plaintiff completed a Function Report indicating that he worked in real estate from 2002 to 2009 and in a clerical role for his wife's ghost-writing business off and on from 2009 to 2013.  [R284].  In his clerical role, Plaintiff indicated he made $50,000 per year working 4 hours a day 5 days a week. [R289].  He indicated that he did writing, completed reports, or performed similar duties, sat 4 hours a day and wrote, typed, or handled small objects 4 hours a day. [*Id.*].  Plaintiff reported that the heaviest weight he lifted was less than 10 pounds and he frequently lifted less than 10 pounds.  [*Id.*].  Plaintiff noted that his Parkinson's disease made fine motor skills difficult and, as the disease progresses, the shaking would make writing and computer work impossible.  [R290].  He said he could no longer write articles and books because staring at a computer screen for extended periods made his dizziness and tremors worse.  [*Id.*].

On August 24, 2017, Plaintiff was seen by Dr. Silver for what Dr. Silver

17

stated he had been calling Parkinson's Disease but which he stated had always had a psychogenic overlay. [R428]. Dr. Silver stated that the diagnosis was in doubt. [*Id.*]. Dr. Silver noted that Plaintiff had different issues over the years but most had come and gone. [*Id.*]. Dr. Silver also noted that Plaintiff had dyskinesias while on medication but no longer had freezing. [*Id.*]. Following a motor exam, Dr. Silver found that Plaintiff's strength, rapid alternating movements, tone, and bulk were all normal. [R429]. He also found slight hypomimia on cranial nerve exam. [*Id.*]. Dr. Silver observed that Plaintiff had moderate dyskinesias in the head but it was strange looking and, after he brought him back so he could turn off, he looked completely normal with no signs of Parkinson's disease. [R430]. Dr. Silver remarked: "This is strange." [*Id.*]. Dr. Silver also noted some dysphagia. [*Id.*].

On December 11, 2017, Plaintiff was seen for a psychological evaluation by Heather Futral, Psy.D., at Northeast Georgia Psychological Services, LLC. [R372]. Plaintiff alleged Parkinson's disease, dizziness, and depression and reported he was unable to work due to dizziness and problems with his fine motor skills. [*Id.*]. He reported that his wife owned a ghostwriting company that he helped with after working in real estate alone did not yield enough income. [R373]. Plaintiff stated that he saw seven neurologists before being officially diagnosed with Parkinson's disease and when he exerted himself he experienced tremors, dizziness, freezing,

18

and dyskinesia.  [*Id.*].  He reported being easily fatigued.  [*Id.*].  He also reported that he could dress himself without assistance.  [R374].

Dr. Futral opined that Plaintiff did not appear to meet the criteria for a mental health disorder.  [*Id.*].  She observed no abnormality in gait, posture, or psychomotor functioning.  [*Id.*].  She determined that her evaluation appeared valid and found that Plaintiff did not meet the criteria for a mental health diagnosis because he did not endorse any significant psychopathology.  [R375].  She found that his prognosis was good and he did not have any impairment in his ability to adapt to normal work and home stressors.  [R375-76].

On February 22, 2018, Drs. David Bailey, Ed.D., and Linda Weigel, M.Ed., performed a psychological evaluation of Plaintiff.  [R379].  Plaintiff stated that he was last employed as a real estate agent in 2010 and then helped his wife with her ghostwriting business.  [R380-81].  He reported being disabled since 2012 and had both mental and physical issues and that whenever he had anxiety his tremors got worse.  [R381].  He stated that he woke up repeatedly during the night.  [R382].  He was observed to have mild to moderate tremors that increased in intensity as the evaluation progressed.  [R383].  His gait was steady and his gross and fine motor coordination were good.  [*Id.*].  He described his energy level as low and said he tires easily.  [R384].  Following testing, it was determined that Plaintiff's

19

ability to understand and carry out simple instructions was good, his ability to get along with the public was limited due to anxiety, he had the ability to timely complete assigned tasks at the level of unskilled labor activities, and there was a moderate chance that he would decompensate under stress.  [R388].

On June 27, 2018, Plaintiff was seen by Dr. Silver complaining of Parkinson's disease.  [R424].  Dr. Silver noted the diagnosis had always been in doubt and there had always been psychogenic overlay.  [*Id.*].  Plaintiff reported that driving at night and looking side to side at a store were problems.  [*Id.*].  He reported feeling fatigued.  [*Id.*].  He stated that he was applying for disability since he could not do continuous work due to his having to lie down from dizziness.  [R424-25].  Dr. Silver noted slight hypomimia on cranial nerve exam.  [R425].  Plaintiff's strength was normal after a motor exam but he had moderately dyskinetic movements in his head that were somewhat rhythmic.  [R426].  Dr. Silver's impression was of Parkinson's disease with many strange physical examinations that were hard to make sense of; unfortunately, a DaTscan[12] test was not covered

---

[12]     "DaTscan is a drug that is injected into the bloodstream to assess dopamine containing neurons, which are involved in controlling movement."  A physician then uses a gamma camera to take pictures and, by analyzing them, a physician "can help determine whether the symptoms [being experienced] are the result of Parkinsonian syndrome," "DaTscan Procedure Information," Cedars Sinai, available          at:          https://www.cedars-sinai.org/programs/imaging-

by Plaintiff's insurance.  [*Id.*].  Dr. Silver expressed "significant doubts" regarding whether Plaintiff actually had Parkinson's disease.  [*Id.*].

On August 17, 2018, Dr. Silver swore out a Medical Affidavit stating that Plaintiff was being treated by him for Parkinson's disease, was permanently disabled, and should not be considered for jury service.  [R413].

A Detailed Earnings Query from September 7, 2018, indicates that Plaintiff earned $42,114 in 2012 and $91,895 in 2013.  [R244-45].

On October 1, 2018, Plaintiff completed a Work Background form indicating that he worked from 2013 to 2016 doing clerical work for his wife part time. [R323].  He stated that he did writing but that he could no longer complete the work due to tremors and dizziness.  [*Id.*].

On April 30, 2019, Plaintiff was seen by Joash Lazarus, M.D., complaining of Parkinson's disease dyskinesia.  [R450].  Plaintiff presented with tremors in his left leg and stated that he started developing worsening dyskinesia 6 months ago. [*Id.*].  In general, he reported that his tremors were controlled.  [*Id.*].  Attempts to reduce Plaintiff's Sinemet in the past had resulted in bradykinesia.  [*Id.*].  Plaintiff reported chronic controlled constipation and urinary urgency but no incontinence.

_____

center/exams/nuclear- medicine/datscan/information.html (last accessed on Mar. 23, 2022).

[*Id.*].  A review of systems indicated that Plaintiff was positive for fatigue, sleep problems and weight loss, as well as dizziness, incontinence, and unsteadiness. [R452].  Plaintiff was not in acute distress, was oriented and had fluent speech, and had a normal gait.  [*Id.*].

On October 4, 2019, Plaintiff was seen in the ED of Northeast Georgia Medical Center following a syncopal episode.  [R456].   Plaintiff had passed out in the bathroom but was essentially unremarkable during the workup.  [*Id.*].

### D.   Vocational-Expert Testimony

The ALJ asked the Vocational-Expert ("VE") to identify Plaintiff's past work, which the VE stated was as a real estate agent and administrative clerk. [R68].   The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work history, but who also had to work at a light exertional level, with no climbing of ladders, ropes or scaffolds, who could occasionally climb ramps and stairs, balance, stoop, knee, crouch, and crawl, who could have no more than occasional exposure to temperature extremes, could not work at unprotected heights or with dangerous machinery, and who could frequently handle and finger bilaterally.  [*Id.*].  The individual would also be limited to routine tasks in a static work environment and no more than occasional public contact.  [*Id.*].  The VE testified that such an individual could perform Plaintiff's past work as an

22

administrative clerk, but not as a real estate agent.  [R69].  The VE testified that such an individual could also perform other jobs, including a photocopying-machine operator, garment sorter, and office helper.  [*Id.*].

The VE testified that reducing the exertional level to sedentary would eliminate all past work.  [*Id.*].  However, such a person could perform other jobs, such as a table worker, agricultural sorter, and circuit board assembler.  [R69-70].  The VE testified that if the handling and fingering requirement was limited to only occasional, all of the previously identified jobs would be precluded.  [R70].  The VE also testified that if a person needed additional breaks throughout the workday, two to three additional 15 to 20 minutes breaks, it would not be tolerated on a sustained basis.  [R70-71].

## VI.    ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

>   1.    The claimant meets the insured status requirements of the Social Security Act on December 31, 2018.
>
>   2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 11, 2012 through his date last insured of December 31, 2018 . . . .
>
>   . . .
>
>   3.    Through the date last insured, the claimant had the following severe impairments: Parkinson's disease and anxiety . . . .

23

. . .

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments  . . . .

. . .

5.      After careful consideration of the entire record, the [ALJ found] that the claimant has the residual functional capacity to perform light work.  The claimant is capable of: occasionally lifting/carrying twenty pounds; frequently lifting/carrying 10 pounds; standing or walking 6 hours of an 8 hour workday; and sitting 6 hours of an 8 hour workday. The claimant cannot climb ladders/ropes/scaffolds. He is capable of occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling.  The claimant should have no more than occasional exposure to temperature extremes.  The claimant cannot work around unprotected heights or dangerous machinery.  He is limited to frequent handling and fingering, bilaterally.  The claimant is limited to routine tasks in a static work environment.  He should have no more than occasional public contact.

6.      Through the date last insured, the claimant was capable of performing past relevant work as an Administrative Clerk.  The work did not require the performance of work-related activities precluded by the claimant's residual functional capacity . . . .

7.      The claimant was not under a disability . . . at any time from October 11, 2012, the alleged onset date, through December 31, 2018, the date last insured . . . .

[R21-31].

The ALJ noted that Plaintiff had acquired sufficient quarters of coverage to remain insured through December 31, 2018.  [R19].  The ALJ noted that he was required to engage in a five-step sequential process in analyzing Plaintiff's claim

24

and, at step one, he had to determine whether Plaintiff had engaged in substantial gainful activity ("SGA"). [R20]. The ALJ noted that if an individual had earnings above a certain amount for employment it was generally presumed that he had the ability to engage in SGA. [*Id.*]. If such was the case, the individual was not disabled. [*Id.*]. At step four in the sequential process, the ALJ noted that he had to determine whether a claimant had the RFC to perform the requirements of his past relevant work, which included work performed within the last 15 years or 15 years prior to the date that disability must be established. [R21].

The ALJ noted that Plaintiff worked after the alleged disability onset date but found that the work did not rise to the level of SGA. [R21]. The ALJ noted that Plaintiff reported self-employment earnings of $91,895 in 2013 and only needed to have made $12,480 to qualify as SGA. [*Id.*]. Regardless, the ALJ gave Plaintiff "the benefit of every doubt" and continued with the sequential analysis. [R21-22].

The ALJ found Plaintiff's severe impairments included Parkinson's disease and anxiety and found no non-severe impairments. [R22]. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [*Id.*]. The ALJ

further found that Plaintiff did not satisfy either the "paragraph B" or "paragraph C" criteria.  [R22-23].

In crafting the RFC, the ALJ considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as medical opinions and prior administrative medical findings.  [R24].  In considering Plaintiff's symptoms, the ALJ noted he was required to follow a two-step process and first ask whether there was an underlying medically determinable impairment that could reasonably be expected to produce a claimant's symptoms.  [*Id.*].  Second, an ALJ was required to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited work-related activities.  [*Id.*].  The ALJ noted that although Plaintiff alleged an inability to work since October 11, 2012, at the administrative hearing he stated that he did clerical work for his wife's business from 2009 to 2013.  [*Id.*].

The ALJ recounted that Plaintiff was seen by Dr. Silver beginning on March 5, 2013 but was never given a clear diagnosis and that Dr. Silver recommended vestibular rehabilitation.  [*Id.*].  Dr. Silver observed almost constant left and right had tremors and left foot tremors at rest.  [R25].  He recommended a higher dose of Sinemet, which would clarify Plaintiff's diagnosis if it worked.  [*Id.*].

26

The ALJ noted that Plaintiff was evaluated by Dr. Tulsa later that month and reported working as a writer.  [*Id.*].  Dr. Tulsa noted no neurologic cause for imbalance and believed Plaintiff had phobic postural vertigo, which was frequent in individuals with obsessive compulsive personality.  [*Id.*].  He recommended selective serotonin reuptake inhibitors as well as counseling and encouraged Plaintiff to walk outside regularly.  [*Id.*].  On May 9, 2013, Plaintiff saw Dr. Silver again and reported his tremors were 80% better and his bradykinesia was eliminated.  [*Id.*].  Dr. Silver found that Plaintiff's anxiety and Parkinson's were much better and his tremors were mostly gone.  [*Id.*].  The ALJ noted that Plaintiff was admitted to the ED in December 2013 but his symptoms resolved by the time was evaluated.  [*Id.*].

In July 2014, Plaintiff returned to Dr. Silver complaining that his tremors had gotten worse over the last 6 months and his Sinemet had been increased.  [*Id.*]. Dr. Silver observed right hand rest tremor for most of the examination and assessed idiopathic Parkinson's disease with some emotional/psychogenic features. [R25-26].  When Plaintiff returned in November 2015, Dr. Silver noted that Plaintiff looked basically normal aside from mild tremors.  [R26].  The ALJ indicated that, in December 2016, Plaintiff reported not having right hand tremors when he walked and noted no tremors on observation.  [*Id.*].  Dr. Silver noted

strange aspects to the case and opined that either there was a psychogenic overlay to Plaintiff's symptoms or he did not have Parkinson's disease. [*Id.*].

The ALJ observed that in an examination on August 23, 2017, Plaintiff had normal strength and rapid alternating movements but was found to have moderately dyskinetic movements in his head; however, after one hour when he was turned off Plaintiff looked completely normal with no signs of Parkinson's disease. [*Id.*]. The ALJ noted that, in December 2017, Plaintiff reported to Dr. Futral during a consultative examination that he could watch television and read books but experienced symptoms of tremors, dizziness and dyskinesia when he physically exerted himself. [R26-27]. Plaintiff stated that his anxiety was no longer a problem. [R27]. Dr. Futral opined, among other things, that Plaintiff would have no impairment in his ability to adapt to normal work stressors. [*Id.*]. In a second consultative examination with Dr. Bailey in February 2018, Plaintiff explained that he had been helping his wife with her ghostwriting business since 2010 and that his tremors increased with anxiety. [*Id.*]. On exam, he displayed mild to moderate tremors during the examination and was diagnosed with generalized anxiety disorder. [*Id.*].

The ALJ noted that, when Plaintiff saw Dr. Silver in June 2018, Plaintiff had lost muscle mass and stated he had dyskinesis until the Sinemet wore off. [*Id.*].

28

He stated that he filed for disability because he had to lie down from dizziness. [*Id.*].   Plaintiff's strength and rapid alternating movements were normal and there were no tremors observed.  [*Id.*].  Dr. Silver expressed significant doubts about whether Plaintiff actually had Parkinson's despite his on-time dyskinesias. [R27-28].  On August 17, 2018, Plaintiff received a letter from Dr. Silver excusing him from jury duty due to his being "permanently disabled."  [R28].

The ALJ indicated that, after the date last insured, Plaintiff established care with Dr. Lazarus in April 2019 and explained that he developed worsening dyskinesia 6 months before, but that his tremor was generally controlled.  [*Id.*]. Dr. Lazarus found normal bulk and tone, mild left hand resting tremor, and intact sensation and gait.  [*Id.*].

The ALJ also summarized Plaintiff's hearing testimony.  [R28-29].  The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence in the record.  [R29].

With regard to the opinion evidence, the ALJ summarized the findings of Drs. Bell-Strayo and Wallace, which supported the overall conclusion that Plaintiff was not completely precluded from work.  [*Id.*].  However, the ALJ found the

opinions not entirely persuasive because, while Plaintiff's Parkinson's disease diagnosis was in question, he still suffered from tremors and dyskinesia that would decrease his RFC.  [*Id.*].  The ALJ found Plaintiff's statements concerning the severity of the limitations imposed by his Parkinson's disease not consistent with the record and noted that he continued to work until 2016 when his wife closed her business and worked 20 hours per week until 2017, which suggested greater functioning than he alleged.  [R29-30].   The ALJ noted that Plaintiff complained of difficulty walking due to fatigue but that his gait was largely normal and there was no evidence of muscle weakness in his lower extremities.  [R30].  The ALJ also found that he could not ignore medical records putting Plaintiff's Parkinson's disease diagnosis in doubt.  [*Id.*].  The ALJ found the mental-health impairments opinions of Dr. Blase and Kelly to be persuasive because they offered cogent rationale accompanied by citations to the medical evidence to support their conclusions.  [*Id.*].  The ALJ noted that, despite symptoms of anxiety, Plaintiff was able to work as a writer for many years after his alleged onset date and did not testify to significant mental health limitations performing his work activity.  [*Id.*].

The ALJ also noted that the VE classified Plaintiff's past work as a real estate agent and administrative clerk and that the RFC would not preclude Plaintiff from performing his past work as an administrative clerk.  [R31].  Based on this

testimony, the ALJ found that Plaintiff was capable of performing his past relevant work for the entire period at issue. [*Id.*]. Parenthetically, the ALJ noted that the VE had testified that other jobs existed in the national economy that Plaintiff could perform, including garment sorter, photocopy machine operator, and office helper. [*Id.*]. Based on these findings, the ALJ determined that Plaintiff had not been under a disability from the alleged onset date to the last date insured. [*Id.*].

## VII.   **CLAIMS OF ERROR**

Plaintiff argues that the ALJ's decision includes conflicting findings as to his past work, and so it not supported by substantial evidence. [Doc. 16 at 9-10]. Plaintiff argues that the ALJ found that he could perform his past relevant work as an administrative clerk, despite finding that he had not performed that work at substantially gainful activity levels. [*Id.*]. However, he contends that a job that was not done at SGA levels is not past relevant work. [*Id.* at 10]. Plaintiff notes that his earning reports indicate that he had self-employed earnings from 2007 to 2013, with earnings of $42,114 in 2012, $91,895 in 2013. [*Id.* at 12]. He also notes that the ALJ found that he did not engage in substantial gainful activity from his alleged onset date in 2012 through his last date insured in 2018. [*Id.*].

Plaintiff argues that the ALJ failed to resolve the conflict between his step one and step four findings and had a duty to resolve conflicts in the evidence. [*Id.*

31

at 13].  He contends that the ALJ's failure to resolve the conflict meant there was not step four or five jobs that he could perform.  [*Id.* at 14].  He argues that, if his past work as not substantial gainful activity, it cannot be considered past relevant work.  [*Id.*].  He further argues that the ALJ failed to address the accommodations he received when finding his time as an administrative clerk was past relevant work.  [*Id.* at 14-15].  Further, Plaintiff contends that he could not do other light, sedentary, unskilled jobs identified by the VE because the combination of his limitations, educational level, and lack of transferable skills rendered him disabled under the Medical-Vocational Guidelines.  [*Id.* at 15].

Next, Plaintiff asserts that the ALJ failed to properly evaluate his statements when rejecting them, rendering the opinion unsupported by substantial evidence.  [*Id.* at 16].  He argues that the ALJ did not apply the regulatory factors when rejecting his statements.  [*Id.*].  He notes that he testified that he stopped working because moving his head and tracking caused dizziness.  [*Id.* at 16-18].  He argues that the ALJ improperly rejected his limitations because he continued to work but did not consider the accommodations that permitted him to continue working.  [*Id.* at 19].  He asserts that the ALJ's conclusion that he was not as limited as alleged because he continued to work until 2016 or 2017 is wrong because he did not work full time and there is no evidence contradicting his testimony that he got

dizzy after working and had to lie down.  [*Id.* at 20].  Plaintiff contends that he was only able to work part time with accommodation and needed to lie down for several hours a day to rest after becoming dizzy.  [*Id.*].  Although the ALJ found that he could do his work as generally performed, Plaintiff argues that he never performed it as it is generally performed.  [*Id.* at 21].  He contends that the ALJ was required to consider the special conditions under which he worked.  [*Id.* at 21-22].  He argues that the ALJ disbelieved his testimony regarding dizziness and needing to lie down but did not point to supportive evidence and there was evidence of dizziness in the record.  [*Id.* at 22-23].

Plaintiff contends that the ALJ's rejection of his limitations because he had normal muscle strength in his lower extremities does not negate that his fatigue resulted in problems walking or standing.  [*Id.* at 23].  He argues that fatigue can limit endurance despite the presence of full muscle strength and the ALJ was not qualified to interpret raw medical data.  [*Id.* at 23-24].  He contends that the ALJ stated that the considered his tremors and dyskinesia in crafting the RFC but did not account for them.  [*Id.* at 24].  Plaintiff further argues that the ALJ wrongly failed to discuss or evaluate the regulatory factors when finding his statements were not supported by the evidence.  [*Id.* at 25].  He contends that the ALJ incorrectly evaluated his symptoms based solely on objective medical evidence when a fully

favorable decision could not be made based upon that evidence.  [*Id.*].  He argues that the record supports symptoms of Parkinson's disease such as tremors. [*Id.* at 25-29].  Plaintiff requests a remand for the calculation of payment of benefits or, alternatively, for further proceedings.  [*Id.* at 29].

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's administrative clerk job is past relevant work. [Doc. 17 at 5].  The Commissioner notes that Plaintiff performed this position for 7 or 8 years and at SGA levels at least in 2010, 2011, and part of 2012.  [*Id.* at 5-6]. The Commissioner argues that the ALJ gave Plaintiff the benefit of the doubt in order to continue with the sequential evaluation for the entire period but did not find that Plaintiff had never performed the administrative clerk job at the SGA level. [*Id.* at 6-7].  The Commissioner submits that the ALJ only considered the time from October 2012, Plaintiff's alleged onset date, while Plaintiff began working as an administrative clerk in 2009.  [*Id.* at 7].  The Commissioner argues there is no conflict between a finding that Plaintiff did not have disqualifying SGA since October 2012 and a finding that Plaintiff acquired past relevant work as an administrative clerk based on pre-alleged onset date earnings.  [*Id.*].  In addition, the Commissioner argues that the alleged accommodations that Plaintiff received were not provided until after his alleged onset date, around 2013, but he worked at

an SGA level well before that time and so his reported accommodations do not impact the ALJ's findings.  [*Id.*].

The Commissioner argues that Plaintiff's argument regarding his ability to perform his past relevant work as generally performed fails for the same reasons. [*Id.* at 7-8].  The Commissioner argues that a claimant is not disabled if they can perform their past work as it is generally performed, even if they have never performed it that way.  [*Id.* at 8].  The Commissioner further contends that the ALJ's step five finding, that Plaintiff could perform additional jobs in the national economy, was solely an alternative to his step four finding.  [*Id.*].

Next, the Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff's statements were not fully consistent with the evidence of record.  [*Id.* at 9].  The Commissioner argues that the ALJ properly reviewed the medical evidence and Plaintiff's complaints and explained that they were inconsistent with his work activity after his alleged onset date, normal objective examination findings, and improvement with medication.  [*Id.* at 10-11].  For example, the Commissioner notes that Plaintiff reported to the ALJ and his treatment providers that his tremors were controlled with medication.  [*Id.* at 11]. The Commissioner argues that although substantial evidence tends to refute Plaintiff's complaints, the ALJ accommodated the complaints that were consistent

with the evidence, and all in all the relevant evidence is adequate to support a finding that Plaintiff statements were not fully consistent with the evidence.  [*Id.* at 12].

The Commissioner next asserts that the ALJ's erroneously stating that his wife's business closed when he stopped working was a minor misstatement and harmless error.  [*Id.* at 12-13].  The Commissioner argues that, although Plaintiff takes issue with the ALJ relying on his post-alleged onset date work activity, the ALJ acknowledged his limited hours and lying down and the fact that he engaged in some work activity tended to undercut Plaintiff's assertions.  [*Id.* at 13].  With regard to Plaintiff's alleged dizziness and need to lie down, the Commissioner argues that the ALJ acknowledged those complaints and the ALJ did not need to address them separately so long as he considered Plaintiff's condition as a whole. [*Id.* at 14-15].  The Commissioner claims that, aside from tremors, the record supports the ALJ's findings regarding dizziness because neurological examinations were normal including in the area of localization.  [*Id.* at 15-16].

The Commissioner contends that Plaintiff's pointing to complaints of dizziness and his doctor's acceptance of such complaints is not sufficient.  [*Id.* at 16].  She notes that opinions regarding disability are reserved for the Commissioner. [*Id.* at 16-17].  The Commissioner argues that normal muscle strength does

undercut a claimant's complaints of fatigue and, in any event, it is not the ALJ's burden to disprove a claimant's claims. [*Id.* at 17]. She contends that, given the overall evidence cited by the ALJ, his findings that Plaintiff's alleged fatigue would not prevent him from doing light work was reasonable. [*Id.* at 17-18]. The Commissioner notes that an ALJ is well-qualified under the regulations to evaluate Plaintiff's RFC based on the record. [*Id.* at 18]. The Commissioner argues that an express analysis of every factor in evaluating his statements is never required. [*Id.* at 18-19]. The Commissioner contends that, contrary to Plaintiff's assertion that an ALJ cannot rely solely on objective evidence to discount his statements, the regulations state that an ALJ cannot rely solely on a lack of objective evidence to substantiate a claimant's symptoms. [*Id.* at 19]. Finally, the Commissioner notes that this Court cannot reweigh the evidence. [*Id.* at 19-20].

In reply, Plaintiff argues that he worked in his past position part-time with accommodation, which the ALJ did not acknowledge without explanation. [Doc. 20 at 1]. Plaintiff argues that, despite the Commissioner's assertion to the contrary, the ALJ did not acknowledge his complaints of dizziness and needed to because it was a key piece of evidence. [*Id.* at 2-3]. He argues that the ALJ's failure to explain why he discounted Plaintiff's dizziness/lightheadedness and fatigue when assessing what he could do despite his impairments meant that the

decision was not supported by substantial evidence.  [*Id.* at 3-4].  Plaintiff notes that the Commissioner cites to a denial of vertigo shortly after his date last insured, but asserts that vertigo and dizziness are not the same.  [*Id.* at 4].  Plaintiff argues that the Commissioner offers no support for its assertion that a lack of weakness on exam undercuts a claim of fatigue or lack of stamina.  [*Id.* at 5].  He contends that while an analysis of each of the relevant factors may not be required, an express analysis is.  [*Id.*].  He argues that he was only able to work 20 hours a week due to his accommodations and that the ALJ did not identify any contrary evidence.  [*Id.* at 6].  He contends that he cannot perform his past work as it is generally performed because he never performed it as it is generally performed.  [*Id.*].

## VIII.   <u>ANALYSIS</u>

After careful consideration of the parties' arguments, the ALJ's decision, and the evidence of record, the undersigned finds that the ALJ's decision was not supported by substantial evidence and was based upon errors of law.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd*, 704 F.2d at 1209.

Plaintiff first argues that because the ALJ's decision includes conflicting findings regarding his past work, it is not supported by substantial evidence. [Doc. 16 at 5, 9-10].  The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's administrative clerk job is past relevant work.

38

[Doc. 17 at 5].  Plaintiff did not address this issue in his reply brief.  [*See* Doc. 20].

In the current matter, the ALJ concluded at step one in the sequential process that, although Plaintiff did work assisting in his wife's ghostwriting business after his alleged disability onset date of October 11, 2012, that work did not rise to the level of substantial gainful activity.  [R20-21].  Specifically, even though Plaintiff reported a total of $91,895.00 in 2013 and SGA levels for that year were $12,480, the ALJ gave the Plaintiff the "benefit of every doubt" and continued the sequential evaluation for the entire period.  [R21-22].  In the fourth step of the sequential evaluation, the ALJ found, by relying on the VE's testimony, that Plaintiff's past ghostwriting work should be classified as an "administrative clerk" and that he was still capable of performing that work as it was generally performed, and so was not disabled.  [R30-31].

The Court finds Plaintiff's assertion that the decision contains conflicting findings to be unpersuasive.   In the first step of the sequential process, the ALJ exercised his discretion in deciding that Plaintiff had not met SGA levels after his alleged onset date in order to permit the sequential evaluation to continue for the entire period.   [R22].  Plaintiff does not directly challenge this finding, [*see* Docs. 16, 20], and the Court declines to find sua sponte that such an exercise of discretion, which is to the benefit of the claimant, was improper.  Instead, Plaintiff

contends that, having found that Plaintiff did not work as an administrative clerk at SGA levels after his alleged onset date, the ALJ erred in finding that it was past relevant work. However, past relevant work includes work that a claimant has done for the previous 15 years, *see* 20 C.F.R. § 404.1560(b)(1) ("Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it"). Plaintiff's alleged onset date was October 11, 2012, [R21], but going back 15 years puts the relevant date significantly before that time. Indeed, Plaintiff testified to working as a ghostwriter from 2009 to 2013, [R45, 264, 284], and the record indicates that Plaintiff made above the SGA level working as a ghostwriter in both 2012 and 2013. [*Compare* R21, *with* R244-45]. The Court therefore finds that, because Plaintiff worked as a ghostwriter prior to his alleged onset date, which was within the 15-year period, and made amounts above the required SGA level,[13] 20 C.F.R. § 404.1560(b)(1), the ALJ did not err in determining for purposes of the fourth step in the sequential process that Plaintiff has past relevant work as an administrative

_____

[13]    The Court notes that Plaintiff has not argued that his work as a ghostwriter did not last long enough for him to learn how to do it. [*See generally* Docs. 16, 20]. The Court therefore does not reach that issue. *See, e.g.*, *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (stating that a party abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner).

clerk.

Next, Plaintiff argues that his wife, as his employer, made accommodations for him, including allowing him to take breaks for an hour to an hour and a half to lie down, that the ALJ failed to address. [Doc. 16 at 14-15]. In response, the Commissioner argues that the accommodations were not provided to him until after his alleged onset date, and so they do not impact the ALJ's finding that his administrative clerk position qualified as past relevant work. [Doc. 17 at 7-8]. The Court notes that Plaintiff testified that it was around 2013 that he had to lessen his work because his dizziness kept getting worse when he tried to track or scroll, and that Plaintiff's alleged onset date was October 2012. [R21, 47-48]. The Court therefore agrees with the Commissioner as to this issue.

Plaintiff additionally argues that the VE testified that there were other unskilled, light and sedentary jobs that he could perform, but given his age, limitations, educational level, and lack of transferable skills, a finding of disability was appropriate under the Medical-Vocational Guidelines. [Doc. 16 at 15]. However, the ALJ's decision is not to the contrary. In fact, the ALJ noted VE testimony that other jobs existed in the national economy that Plaintiff could perform, but only for the period from his alleged onset date, October 11, 2012, through June 15, 2018, after which he would have turned 56 years old and moved

41

into the next age category for purposes of the Social Security regulations. [R31; *see also* Doc. 17 at 8]. The Court therefore finds Plaintiff's assertion unpersuasive.

In his second claim of error, Plaintiff argues that the ALJ failed to properly evaluate his symptoms when rejecting them and, as a result, the decision is unsupported by substantial evidence. [Doc. 16 at 16]. The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's statements were not fully consistent with the evidence of record. [Doc. 17 at 9-10].

In the present case, the ALJ noted that he considered all the symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence, opinion evidence, and prior medical findings. [R24]. In reaching his conclusion, the ALJ reviewed Plaintiff's testimony, [R29], medical records, [R24-28], and medical opinion evidence, [R29]. The ALJ then concluded that Plaintiff's allegations regarding the severity and limitations imposed by his Parkinson's disease were not consistent with the medical and other evidence of record. [*Id.*]. Specifically, the ALJ found that he was able to work 20 hours per week until 2016, which indicated that he had greater functioning than alleged, and although he asserted difficulty walking due to fatigue, his gait was largely within normal limits and no muscle weakness was documented. [R30]. The ALJ further

noted records raising doubts about whether Plaintiff actually had Parkinson's disease but that the record indicated some improvement with medications.  [*Id.*].

Plaintiff argues, first, that the ALJ erred by rejecting his statements about his limitations but not applying the regulatory factors to make his decision.  [R16, 18-19].  However, the caselaw in this Circuit has made clear that an ALJ is not required to discuss each individual factor set out in 20 C.F.R. § 404.1529(c)(3).  *See, e.g.*, *Loveless v. Colvin*, No. 6:14-CV-01773-LSC, 2015 WL 8002704, at *5 (N.D. Ala. Dec. 7, 2015), *aff'd sub nom. Loveless v. Comm'r, Soc. Sec. Admin.*, 678 Fed. Appx. 866 (11th Cir. Feb. 1, 2017) (citing *Dyer*, 395 F.3d at 1211)).  Plaintiff also argues that the ALJ mistakenly asserted that his wife closed her ghostwriting business in 2017, when in reality that was when he stopped working.  [Doc. 16 at 19].  While the Court agrees, Plaintiff does not explain the importance of the mistake, and its importance is not apparent, so the Court therefore finds it to be harmless error.  *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis where the ALJ made an incorrect statement of fact).

Next, Plaintiff argues that the ALJ failed to take into consideration the special accommodations that allowed him to work and failed to address his

43

dizziness and need to rest. [Doc. 16 at 19]. In other words, he argues that the only reason he could continue in this position is because he was working for his wife. [*Id.* at 14]. The Court notes that Plaintiff worked as a ghostwriter for his wife's business and not for a third party. [R45; *see also* [Doc. 16 at 19-20]]. He testified that he worked part-time and did not have set hours. [R46]. Relatedly, he testified that he worked 20 to 25 hours a week and it became less and less as time went on because it made him too dizzy. [R48-49]. He stated that when he started out, he could work for an hour or two hours and then have to lay down for an hour and a half or two hours. [R51]. By the end, he testified that he was basically useless. [R52].

The ALJ indicated that in reviewing Plaintiff's testimony, he stated that he did not work full-time and needed to take breaks, [R24] but the ALJ did not expressly discount his complaints of dizziness and his need to lie down, [R19-32]. The ALJ also did not address Plaintiff's argument that he was only able to work, even part time, with the special accommodation provided by his wife that would not be available from a third-party employer. [*Id.*]. The Commissioner admits as much, but argues that the fact that Plaintiff could work part time undercuts his assertions, that the ALJ noted his complaints, and that an ALJ is not required to provide additional articulation because an ALJ need only consider Plaintiff's

condition as a whole and need not contradict each and every complaint. [Doc. 17 at 13-15].

The Court agrees with Plaintiff. As discussed above, the ALJ found that Plaintiff was not disabled because he could perform his past relevant work. [R31]. However, Plaintiff gave uncontradicted testimony during the administrative hearing that his dizziness and need to lie down for hours at a time reduced his ability to do his past relevant work, as a ghostwriter until, in 2016 or 2017, he was forced to stop altogether. [R52]. At the administrative hearing, Plaintiff agreed that dizziness was his main problem. [R49-50]. He also stated that all of his medications made him dizzy. [R63]. The ALJ's assertion that Plaintiff could perform his past relevant work without explicitly addressing the reasons given by Plaintiff for being unable to continue that work, even part-time and with accommodations, is notable. While it is true that the ALJ found that Plaintiff could do his past relevant work as it was generally performed, not as actually performed, there is no explanation of the distinction between the two or why Plaintiff would be able to do one but not both. In this regard, the Court notes that an ALJ must build a logical bridge from the evidence to his conclusion. *See Flentroy-Tennant v. Astrue*, No. 3:07-cv-101-J-TEM, 2008 WL 876961, at *8 (M.D. Fla. Mar. 27, 2008) (quoting *Baker v. Barnhart*, No. 03-C-2291, 2004 WL 2032316, ("An ALJ

is required to build an accurate and logical bridge from the evidence to his or her conclusion").[14]

The Court further points out that the medical record contains numerous instances of Plaintiff asserting dizziness, including in March 2013, [R333], August 2017, [R290], November 2017, [R372], June 2018, [R424-25], and April 2019, after the date last insured, revealing that Plaintiff was positive for ataxia, dizziness, and unsteadiness.   [R452].   Plaintiff also repeatedly complained of fatigue, including in June 2018, [R424], and April 2019, [R450].  The Commissioner argues that these are only examples of doctors accepting Plaintiff's complaints.  [Doc. 17 at 16].  However, even if Plaintiff's complaints were only subjective, that alone is an insufficient basis for rejecting them.  *Brown v. Soc. Sec. Admin., Comm'r*, No. 5:17-CV-02010-SGC, 2019 WL 1296325, at *7 (N.D. Ala. Mar. 21, 2019) (collecting cases); see also 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or

---

[14]     The Commissioner points to *Newberry v. Comm'r, Soc. Sec. Admin.*, 572 Fed. Appx. 671, 672 (11th Cir. July 14, 2014) in support of her position. [Doc. 17 at 15-16].  However, in *Newberry*, the Eleventh Circuit found that an ALJ's credibility determination was terse but sufficient, because, among other reasons, he considered the claimant's symptoms and their frequency. *Id.*  Because it is not clear that the ALJ considered all of Plaintiff's symptoms here, the Court finds *Newberry* to be distinguishable.

about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements").

The Commissioner points to additional evidence it argues supports the ALJ's decision, but those arguments were not made by the ALJ himself. This Court will decline to affirm a decision simply because some rationale may support an ALJ's conclusion. *Gorham v. Astrue*, No. 1:11-CV-3555-CAP-JSA, 2012 WL 5507306, at *6 (N.D. Ga. Nov. 14, 2012) (quoting *Lawton v. Comm'r of Soc. Sec.*, 431 Fed. Appx. 830 (11th Cir. June 22, 2011)).

Additionally, the Commissioner argues that the ALJ need not address each complaint individually and need only consider a claimant's condition as a whole. *See, e.g., Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). Phrased differently, a decision must also be sufficient to allow a reviewing court to determine that the ALJ considered the entirety of Plaintiff's condition. *Newsome ex rel. Bell v. Barnhart*, 444 F. Supp. 2d 1195, 1198-1200 (M.D. Ala. 2006). In the present case, the ALJ apparently rejected Plaintiff's complaints of fatigue and dizziness, but the basis for his doing so is not clear from the opinion and so the Court finds that decision is insufficient to permit the necessary review. *Id.*

In addition, the Court finds that this error was not harmless, *Walker*, 826 F.2d at 1002; *Diorio*, 721 F.2d at 728, as the VE testified that an individual

47

who would need the type and length of breaks that Plaintiff described, [R51, 70-71], would not be able to find competitive employment whether it was Plaintiff's past relevant work or other work in the national economy.  Accordingly, the Court finds that reversal is required.

Given this conclusion, the Court does not reach the additional arguments raised by Plaintiff.  [*See* Doc. 16 at 23-24].  The Court recognizes Plaintiff's request that this issue be remanded for only for the calculation of and payments of benefits, [Doc. 16 at 29], but declines to issue such an order.  The ALJ did not make findings regarding the issues raised by the Court above and the undersigned declines to do so in the first instance.

## IX.   **CONCLUSION**

In conclusion, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this Order and Opinion.

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 25th day of March, 2022.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE